## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

SHELLY ROSE OLSON,

        Plaintiff,

v.                                    Case No:  6:13-cv-1886-Orl-40KRS

WILLIAM BARRETT, DENNIS BELL,
JOSEPH BOLOGNA, MICHAEL HILL,
BOBBY LUBRIDO, DANIEL
MATTINGLY, J. MATTINGLY,
STEPHEN ROGERS, DANIEL SACCO,
CITY OF OVIEDO, FLORIDA, and
SPRINT/UNITED MANAGEMENT
COMPANY,

        Defendants.

_____/

## <u>ORDER</u>

This cause comes before this Court on the following:

1. Defendants William Barrett, Dennis Bell, Joseph Bologna, Michael Hill, Bobby Lubrido, Daniel Mattingly, J. Mattingly, Stephen Rogers, and Daniel Sacco's Motion to Dismiss Third Amended Complaint, or, in the Alternative, Motion for More Definite Statement and Memorandum of Law (Doc. 71), filed June 24, 2014;

2. Defendant City of Oviedo's Motion to Dismiss Third Amended Complaint, or, in the Alternative, Motion for More Definite Statement and Memorandum of Law (Doc. 72), filed June 24, 2014;

3. Plaintiff's Amended Response in Opposition to Defendants' City of Oviedo and William Barrett, Dennis Bell, Joseph Bologna, Michael Hill, Bobby Lubrido, Daniel Mattingly, J. Mattingly, Stephen Rogers, and Daniel Sacco's Motion to Dismiss

Third Amended Complaint, or, Alternatively, For More Definite Statement (Doc. 82), filed July 30, 2014;

4.  Sprint/United Management Company's Motion to Dismiss the Third Amended Complaint (Doc. 83), filed July 31, 2014; and

5.  Plaintiff's Response in Opposition to Defendant's, Sprint/United Management Company, Motion to Dismiss Third Amended Complaint (Doc. 86), filed August 25, 2014.

Upon consideration, the Court grants in part and denies in part Defendants' motions.

## I.  BACKGROUND[1]

Plaintiff, Shelly Rose Olson ("Plaintiff"), brings this action as the personal representative of the estate of her daughter, Rebecca Olson ("Ms. Olson"), against Sprint/United Management Company ("Sprint") as well as the City of Oviedo, Florida ("the City") and nine individually named police officers (collectively, the "Oviedo Officer Defendants") employed with the Oviedo Police Department ("OPD"). (Doc. 69). Ms. Olson was employed by Sprint and was on leave from work under the Family Medical Leave Act ("FMLA") from 2008 to 2011 due to her 2008 diagnosis of bipolar disorder, depression, and panic attacks.  (*Id.* ¶¶ 17–18, 20). Sprint was aware of Ms. Olson's emotional and mental conditions and of a previous suicide attempt by Ms. Olson in December 2010. (*Id.* ¶ 22). Ms. Olson's superiors and co-workers even described her as "unstable." (*Id.* ¶ 23).

---

[1] This account of the facts is taken from Plaintiff's Third Amended Complaint (Doc. 69), the allegations of which the Court must accept as true for the purposes of considering Defendants' motions to dismiss.  *See SEC v. ESM Grp., Inc.,* 835 F.2d 270, 272 (11th Cir. 1988).

While at Sprint, Ms. Olson was subject to "bullying," of which Ms. Olson's superiors were aware. (*Id.*).

In December 2011, Sprint placed Ms. Olson on administrative leave "following an altercation with one of Ms. Olson's co-workers." (*Id.* ¶ 24). While on administrative leave Ms. Olson communicated to her superiors that she was depressed about possibly losing her job with Sprint. (*Id.*). Ms. Olson continuously communicated to Sprint that her job was important to her. (*Id.*). In response, Sprint informed Ms. Olson that a decision regarding her employment was out of their hands and would be made by the corporate office. (*Id.*). However, her superiors also informed her that they would hold a meeting with Ms. Olson to discuss her employment status and her treatment by her co-workers. (*Id.*).

Ms. Olson made numerous calls to her superiors on December 5, 6, and 7. (*Id.* ¶ 25). She communicated to one supervisor, Susan Jones, that she would do anything to keep her job, and that if she lost her job, she would have "nothing to live for." (*Id.* ¶¶ 26–27). Susan Jones informed Ms. Olson that a decision regarding her employment was in the hands of the corporate office. (*Id.* ¶ 28). On December 7, 2011, Sprint terminated Ms. Olson's employment at approximately 12:50 p.m,[2] despite Ms. Olson's superiors' promises that they would conduct a face-to-face meeting with her. (*Id.* ¶ 30).

Expecting Ms. Olson to take this recent news extremely hard, Sprint contacted OPD at 12:57 p.m. and requested a well-being check on Ms. Olson. (*Id.* ¶¶ 30–31). OPD dispatched Officer Charles Crutcher, an OPD officer,[3] to Ms. Olson's address to follow-up on the well-being check. (*Id.* ¶ 34). Ms. Olson was not at home, but Officer Crutcher

---

[2] For the duration of the Background section, all times referenced take place on December 7, 2011 unless otherwise stated.
[3] Officer Charles Crutcher is not a Defendant in this action. (*See* Doc. 69).

was able to contact Ms. Olson on his personal cell phone at her mother's home with the assistance of the Oviedo Dispatching Communications Center ("ODCC"). (*Id.* ¶ 35).  Ms. Olson informed Officer Crutcher that she was distressed over losing her job. (*Id.*).  Officer Crutcher cleared the call without making a report, but later informed investigators that he could tell Ms. Olson was upset when he spoke to her on the phone.  (*Id.*).

During this time, Ms. Olson contacted Nicole Jerys, a former co-worker.  (*Id.* ¶ 39).  Jerys believed Ms. Olson was in shock over losing her job with Sprint and placed an emergency call to ODCC at 3:15 p.m. to request a suicide check because Ms. Olson was unstable and had firearms in her residence.  (*Id.* ¶¶ 39–40).  ODCC dispatched three officers to conduct a suicide check. (*Id.* ¶¶ 40–42). The officers who responded to Jerys' call were Bobby Lubrido, J. Mattingly, and Daniel Mattingly.  (*Id.* ¶ 43).  The call was classified as "attempted suicide."  (*Id.*).  Officers Lubrido and D. Mattingly made contact with Ms. Olson outside her residence. (*Id.*). Ms. Olson's friend, Chris McKinney, was also at the scene.  (*Id.*).   None of the responding officers checked inside Ms. Olson's residence and Officer D. Mattingly canceled the call at 3:47 p.m. (*Id.*).

At approximately 5:37 p.m., two private citizens notified OPD about a truck being driven erratically in their neighborhood, which was verified to be Ms. Olson's vehicle.  (*Id.* ¶ 44).  Ms. Olson's vehicle eventually collided with a parked vehicle on her residential street, and ODCC dispatched officers to Ms. Olson's home to investigate. (*Id.* ¶¶ 44–45).  The first responding officers on the scene—William Barrett, Mitchell Hill, D. Mattingly, Bobby Lubrido, J. Mattingly, and Steven Rogers—found McKinney sitting on the passenger side of Ms. Olson's vehicle and witnessed Ms. Olson exiting from the driver's side.  (*Id.* ¶ 46).

ODCC notified all responding officers around 5:40 p.m. of the previous suicide check on Ms. Olson. (*Id.* ¶ 48). Officer Hill arrived shortly thereafter and made contact with Ms. Olson. (*Id.* ¶¶ 49–50). As part of his investigation of the previous traffic accident, Officer Hill requested Ms. Olson's driver's license. (*Id.* ¶ 50). Instead, Ms. Olson handed Officer Hill her concealed weapons ID. (*Id.* ¶ 51). Officer Hill then instructed Ms. Olson to go in her house and retrieve her driver's license. (*Id.* ¶¶ 52–54). Ms. Olson went inside her home unattended. (*Id.* ¶ 55). Meanwhile, McKinney pleaded with the officers on scene to accompany Ms. Olson inside her home, but the officers refused. (*Id.* ¶ 55).

Officer Joseph Bologna arrived on the scene at 5:50 p.m., at which point Ms. Olson had been in her home unattended for approximately eight minutes. (*Id.* ¶ 56). Officer Bologna promptly began investigating the earlier car accident to determine who was driving Ms. Olson's vehicle when it crashed into the parked vehicle. (*Id.* ¶ 56). The officers focused much of their attention on McKinney despite the fact that other officers saw Ms. Olson leaving the driver's side door. (*Id.* ¶¶ 57–58). During this time, McKinney repeatedly pleaded with the officers to check on Ms. Olson, who was still inside her home unattended, because she was not stable. (*Id.*).

At 5:53 p.m., Officer Bologna made contact with Ms. Olson inside her home. (*Id.* ¶ 59). Officer Bologna suspected McKinney was driving the vehicle due to witness testimony, and began to question Ms. Olson. (*Id.* ¶ 60). Upon completing his questioning of Ms. Olson, Officer Bologna left Ms. Olson, who had begun to cry, after threatening to take McKinney to jail if she was not honest with him. (*Id.* ¶¶ 60–61). Officer Bologna then went to his vehicle and requested information on Ms. Olson. (*Id.* ¶¶ 62–64). Officer Bologna turned his in-dash audio and video camera off at this point. (*Id.* ¶ 64).

At 6:01 p.m., Officers D. Mattingly, Barrett, and Bologna entered Ms. Olson's residence and immediately heard a shotgun blast. (*Id.* ¶ 67).  Simultaneously, McKinney had run around the side of Ms. Olson's house with Officers Hill, Cox, and Rogers chasing behind him. (*Id.* ¶ 68). At this time, McKinney saw Ms. Olson pull the trigger of her shotgun with her big toe, shooting herself in the chest. (*Id.* ¶¶ 68, 77).  McKinney attempted to run to Ms. Olson's aid but was restrained by Officers Bologna, Hill, Barrett, Rogers, Cox, and D. Mattingly.  (*Id.* ¶¶ 69–70).  Officer Bologna checked Ms. Olson for a pulse and found that she still had a slight pulse. (*Id.* ¶ 71). None of the officers provided Ms. Olson with basic life support at this time, and no ambulance was called. (*Id.*).   At 6:01 p.m., after shooting herself, Ms. Olson tried to call Jerys for help. *(Id.* ¶ 77). Somehow, Ms. Olson was able to dial Jerys but got her voicemail. (*Id.*). At 6:02 p.m., Officer D. Mattingly stated over dispatch that Ms. Olson had sustained a fatal gunshot wound, while Officer Bologna radios that they are "taking one down, right now" and declares the scene secure. (*Id.* ¶ 76).

Lieutenant Dennis Bell arrived on the scene at 6:03 p.m.  (*Id.* ¶ 72).  Lieutenant Bell did not administer life support or order any officers to administer life support to Ms. Olson.  (*Id.*).  Lieutenant Bell also twice refused the life support services offered by Ms. Olson's neighbor, a registered nurse, and canceled the rescue vehicles, which had been dispatched at an unspecified time.  (*Id.*).  At 6:04 p.m., Officer Captellas[4] arrived with his K9 partner. (*Id.* ¶ 80). The two entered the home, where an unknown officer said to Officer Captellas, "I feel bad . . . we got careless."  (*Id.* ¶¶ 78–80). McKinney again demanded

---

[4] Officer Captellas is not a defendant in this action. (*See* Doc. 69).

that the officers check on Ms. Olson in the backyard; the officers refused to do so and instructed McKinney to sit down. (*Id.* ¶ 81).

Officer Meyers[5] and Sergeant Sacco arrived on the scene at 6:07 p.m. and walk to the backyard by 6:09 p.m., approximately 1 minute before paramedics are on the scene. (*Id.* ¶¶ 73, 87). Neither administered basic life support to Ms. Olson. (*Id.*). At approximately 6:09 p.m., Officer Bologna is observed by Officer Myers standing within one foot of Ms. Olson, who is still alive, and rather than providing life support he is securing the shotgun. (*Id.* ¶ 74). At this time, Officer Meyers witnessed Ms. Olson lying face down in the dirt but still breathing. (*Id.*). Officer Meyers rolled Ms. Olson on her back, applied pressure to Ms. Olson's wound, and asked Ms. Olson, "If you can hear me let me know," to which Ms. Olson responded by blinking. (*Id.*). Officers Barrett and Hill focus on placing crime scene tape around the front of the residence instead of providing life support to Ms. Olson. (*Id.* ¶ 78).

Of note, Martin Joyce was a dispatcher for Seminole County Department of Public Safety, Emergency Communications Center who monitored the intercom traffic and dispatched fire and medical units according to dispatch guidelines. (*Id.* ¶ 82). Joyce called Autumn Fuller, the Seminole County Public Safety Dispatcher, about the scene at Ms. Olson's house and she subsequently entered the call as milestone 9B. (*Id.* ¶ 83). Milestone 9B means obvious death. (*Id.*). Joyce dispatched fire engines and an ambulance to Ms. Olson's address at some unspecified time. (*Id.* ¶ 85). Upon the fire engine and ambulance arriving at Ms. Olson's address, Joyce heard radio communications from rescue personnel stating that the police officers had not helped Ms.

---

[5] Officer Meyers is not a defendant in this action. (*See* Doc. 69).

Olson and that the officers had left the rescue personnel "nothing to work with." (*Id.* ¶ 86). Ms. Olson's neighbor, Sara Lasher, also heard this statement.  (*Id.*).  By 6:10 p.m., the paramedics at Ms. Olson's address determined that she was not dead.  (*Id.* ¶ 87).

From 6:03 p.m. to 6:12 p.m., ODCC circulated internal calls yet did not request assistance from Seminole County Emergency Communication Center.   (*Id.* ¶ 90). Therefore, there were no status updates or radio dispatches to let Seminole County responders know Ms. Olson's conditions or needs. (*Id.*). As a result of the failure to provide status updates or radio updates, dispatch of Air Care from Orlando Regional Medical Center was delayed.  (*Id.*). Ms. Olson died at Orlando Regional Medical Center at 6:49 p.m. on December 7, 2011. (*Id.* ¶ 92).

Plaintiff initiated this action on December 9, 2013. (Doc. 1). Plaintiff's Third Amended Complaint is currently the operative pleading. Count I of Plaintiff's Third Amended Complaint asserts a claim for wrongful death against Sprint. Count II asserts a § 1983 claim for substantive due process violation against the Oviedo Officer Defendants. Count III asserts a § 1983 cause of action for medical indifference against the Oviedo Officer Defendants. Count IV asserts a wrongful death claim against the Oviedo Officer Defendants. Count V asserts a claim for wrongful death against the City. Finally, Count VI asserts a § 1983 cause of action for failure to train against the City. The Defendants have moved to dismiss the Third Amended Complaint in its entirety.

## II.    STANDARD OF REVIEW

In order to survive a motion to dismiss made under Federal Rule of Civil Procedure 12(b)(6), the complaint must "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  A claim is plausible on its face when the

plaintiff alleges sufficient factual allegations to "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Mere legal conclusions or recitation of the elements of a claim are not enough. *Twombly*, 550 U.S. at 555.  District courts must accept all well-pleaded allegations within the complaint as true. *Id.*  Courts must view the complaint in the light most favorable to the plaintiff and must resolve any doubts as to the sufficiency of the complaint in the plaintiff's favor. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir. 1994).

## III.   DISCUSSION

### A. Count I: Wrongful Death Act Claim Against Sprint

Plaintiff brings a claim under Florida's Wrongful Death Act, Fla. Stat. §§ 768.18–.26, against Sprint.[6] In Count I, Plaintiff alleges that employers have a general duty to protect their employees from reasonably foreseeable harm. (Doc. 69, ¶ 94). Specifically, Plaintiff alleges that Sprint knew or should have known that Ms. Olson was being bullied and harassed at work, and, therefore, Sprint had a duty to prevent such treatment and "afford her the minimal decency of firing her in person, especially knowing her fragile state of affairs." (*Id.* ¶ 95). Plaintiff further alleges that, because of its knowledge, Sprint had a heightened duty to terminate Ms. Olson in a safe and prudent manner. (*Id.* ¶¶ 99–100).

---

[6] There is no common law cause of action for wrongful death in Florida. *Cinghina v. Racik*, 647 So. 2d 289, 290 (Fla. Dist. Ct. App. 1994). Instead, a plaintiff must state a cause of action in accordance with Florida's Wrongful Death Act, which creates a statutory cause of action. *Id.* A right of action exists under Florida Statute § 768.19 when the death of the plaintiff is caused by the negligence of another and the event would have entitled the person injured to maintain an action and recover damages if death had not resulted.  Fla. Stat. § 768.19.

Sprint argues that it owed no duty of care of care to Ms. Olson under the facts of this case.

In order to successfully assert a wrongful death claim based on negligence, a plaintiff must establish: (1) a legal duty owed to the decedent; (2) a breach of that duty; (3) that the legal or proximate cause of death was the breach; and (4) consequential damages.  *See Williams v. Davis,* 974 So. 2d 1052, 1056 (Fla. 2007). The Florida Supreme Court expressed in *Kaisner v. Kolb*, 543 So. 2d 732, 735 (Fla. 1989), that "where a defendant's conduct creates a foreseeable zone of risk, the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses." As the Florida Supreme Court later explained in *McCain v. Florida Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992), a foreseeable zone of risk includes conduct that "foreseeably created a broader 'zone of risk' that poses a general threat of harm to others." However, the existence of "a legal duty is not [always] established by evidence of foreseeability alone."  *Aguila v. Hilton, Inc.*, 878 So. 2d 392, 396 (Fla. Dist. Ct. App. 2004), *rev. denied*, 891 So. 2d 549 (Fla. 2004). There must also be evidence showing that, under the *Kaisner-McCain* rule, the defendant's conduct *created* the risk.  *Id.* at 396–97.

In regards to suicide specifically, "whether explained by the absence of a duty to prevent an unforeseeable harm or explained by a lack of proximate cause because a suicide is an intervening cause that is unforeseeable, the law protects a person from liability for another's suicide absent a special relation or unless the defendant has facilitated or contributed to the suicidal impulse by some wrongful action." *Estate of Brennan v. Church of Scientology Flag Serv. Org., Inc.*, 832 F. Supp. 2d 1370, 1381 (M.D.

Fla. 2011). Simply stated, "[I]mplicit in the special relationship exception is the proposition that the special relationship 'must include *the right or the ability to control another's conduct.*'"  *Aguila,* 878 So. 2d at 399 (quoting *Garrison Retirement Home Corp. v. Hancock*, 484 So. 2d 1257, 1261 (Fla. Dist. Ct. App. 1985)) (additional emphasis added).

A body of case law has arisen involving the specific duty owed by employers in the employment context. Generally, the duty owed by an employer to an employee is conditioned upon:

> [T]he employee "acting within the scope of [her] employment."  As a consequence, if the employee's actions cannot be said to be within the scope or course of [her] employment, no duty is placed on the employer to exercise reasonable care to avert the threatened harm. "Scope of employment" is defined as, among other things, "the field of action in which a servant is authorized to act out in the master-servant relationship." This is similar to the definition applied to "course of employment" in the law of workers' compensation: "[T]he time, place, and circumstances under which the accident occurs."  It follows that if an injury takes place while an employee is outside the scope of employment, the employer cannot be held responsible for same.

*Hernandez v. Tallahassee Med. Ctr., Inc.*, 896 So. 2d 839, 843 (Fla. Dist. Ct. App. 2005) (internal citations omitted).

Dispositive of Plaintiff's claim is that Sprint and Ms. Olson were in an employer-employee relationship, and none of the facts alleged demonstrate that Ms. Olson's shooting occurred in the scope or course of employment with Sprint. While Ms. Olson suffered hateful remarks from co-workers and Sprint knew of this treatment and failed to put a stop to it, such actions alone do not give rise to a duty to prevent her from later committing suicide.

Plaintiff relies heavily upon Sprint's knowledge of Ms. Olson's precarious mental state as grounds for implying a duty upon Sprint as Ms. Olson's employer. (Doc. 86,

pp. 4– 6). While one of Ms. Olson's superiors called the police after terminating her and requested they perform a safety check on her, these facts do not give rise to a duty to prevent the harm that befell Ms. Olson. The facts as alleged demonstrate that Sprint did not owe a duty to Ms. Olson, and thus, Plaintiff's claim for wrongful death against Sprint is due to be dismissed with prejudice.

### B. Counts Against the Oviedo Officer Defendants

The Oviedo Officer Defendants move to dismiss Counts II and III of Plaintiff's Third Amended Complaint on the ground that they are entitled to qualified immunity. The issue of qualified immunity is a legal question for the court that should be decided as early as possible in the case. *See Ansley v. Heinrich*, 925 F.2d 1339, 1347 (11th Cir. 1991).

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "In order to receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id*. From the face of the Third Amended Complaint, Plaintiff has alleged that the Oviedo Officer Defendants were acting within their discretionary authority at all times, and Plaintiff does not claim otherwise in her response to the Oviedo Officer Defendants' motion to dismiss. (*See* Doc. 82, pp. 8–9).

The burden then shifts to Plaintiff, who must make a two-part showing. First, she must demonstrate that the facts of the case make out a violation of a constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Beshers v. Harrison*, 495 F.3d 1260, 1265 (11th Cir. 2007). Second, she must demonstrate that the constitutional right was "clearly established" at the time of the alleged misconduct.[7] *Pearson*, 555 U.S at 223. "When conducting a qualified immunity analysis, district courts must take the facts in the light most favorable to the party asserting the injury." *Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005). This construction "eliminates all issues of fact" such that "the court has the plaintiff's best case before it." *Id.*

### 1. Count II: § 1983 Claim for Substantive Due Process and Whether There is a Violation of a Constitutional Right

In Count II, Plaintiff brings a claim for violation of substantive due process against the Oviedo Officer Defendants under 42 U.S.C. § 1983. Section 1983 authorizes private parties to enforce their federal constitutional rights against defendants who acted under color of state law. Plaintiff alleges that the Oviedo Officer Defendants cut off Ms. Olson's ability to care for her own well-being while she was in their custody and that these defendants were under a "constitutional duty to protect" Ms. Olson. (Doc. 69, ¶ 111). Specifically, Plaintiff alleges that the Oviedo Defendants violated Ms. Olson's substantive right to due process guaranteed by the Fourteenth Amendment because these

---

[7] The Court may address the prongs of the qualified immunity inquiry in any order, although the United States Supreme Court encourages courts to address the constitutional violation prong first so as to develop a body of clearly established law on the often fact-specific inquiries that arise in the context of § 1983 claims. *See Pearson*, 555 U.S. at 236 ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

defendants were "deliberately, consciously and intentionally indifferent to [Ms. Olson's] known mental health risks." (*Id.* ¶ 112). The allegations in Count II are directed towards the Oviedo Officer Defendants' actions *prior* to Ms. Olson shooting herself. The allegations include the failure to "make a reasonable inquiry regarding the circumstances of Ms. Olson's mental health condition," "failure to seek reasonably and readily available mental health services" for her, and "failure to monitor Ms. Olson[] at the investigation scene when she was a suspect" in a traffic accident. (Doc. 69, ¶ 112).

In order to state a § 1983 claim, "[A] plaintiff must show that he or she was deprived of a federal right by a person acting under color of state law." *Woods v. Miller*, 215 F. App'x 796, 797 (11th Cir. 2007) (internal quotation marks omitted). "The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 272 (1994). The Supreme Court has been "'reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.'" *Id.* (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)). As with other areas of the law, "[r]ules of due process are not . . . subject to mechanical application." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998). Importantly, courts must be mindful to "prevent the Fourteenth Amendment from becoming a surrogate for conventional tort principles." *Nix v. Franklin Cnty. Sch. Dist.*, 311 F.3d 1373, 1376 (11th Cir. 2002).

Courts have taken several different approaches to substantive due process claims depending on the circumstances of the case. One approach taken by the Supreme Court in *County of Sacramento v. Lewis*, employed a "shocks the conscious" standard. 523 U.S.

833 (1998). In *Lewis*, a motorcycle passenger was killed in a high-speed police chase after being struck by the pursuing police officer's car. *Id.* at 836–37. The decedent's parents and estate brought a § 1983 action against the county, the police department, and the officer who ultimately struck and killed the decedent, alleging a deprivation of the decedent's Fourteenth Amendment substantive due process right to life. *Id.* at 837–838.

In examining the substantive due process claim, the Supreme Court stated that "only the most egregious official conduct can be said be 'arbitrary in the constitutional sense.'" *Id.* at 846 (quoting *Collins*, 503 U.S. at 129)). To that end, the question the Supreme Court asked was whether the actions taken by the officer "shock[ed] the conscience." *Id.* In defining this standard, the Supreme Court stated that official action most likely to rise to a conscience-shocking level is "conduct intended to injure in some way unjustifiable by any government interest." *Id.* at 849; *Daniels v. Williams*, 474 U.S. 327, 331 (1986) ("Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property." (emphasis in original)). The Supreme Court was mindful to caution that "the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with the state authority causes harm." *Lewis*, 523 U.S. at 848.

Here, Plaintiff first argues that the facts of this case demonstrate that a custodial relationship existed between Ms. Olson and the Oviedo Officer Defendants. (Doc. 82, p. 9). While Plaintiff makes several oblique references to Ms. Olson feeling that she was not free to leave, the facts of the Third Amended Complaint do not demonstrate that Ms. Olson was incarcerated or under arrest to establish that a custodial relationship existed. Nevertheless, Plaintiff maintains that her claim can still survive even if the Court views

the relationship between Ms. Olson and the Oviedo Officer Defendants as non-custodial. (*Id.*). To that end, Plaintiff claims that the facts demonstrate that the Oviedo Officer Defendants were deliberately indifferent towards Ms. Olson. (*Id.* at pp. 9–10).

Such facts are not alleged in Count II. Rather, Plaintiff's allegations sound in negligence. "[T]he [Supreme] Court has made clear that a showing of mere negligence is insufficient to make out a constitutional due-process claim." *Nix*, 311 F.3d at (citing *Cnty. of Sacramento*, 523 U.S. at 849). The Supreme Court has recognized that actions which are intended to injure are most likely to be conscious shocking. *Cnty. of Sacramento*, 523 U.S. at 849. Ultimately, whether such actions rise to the level of conscious-shocking is "context-specific." *Nix*, 311 F.3d at 1376. A review of Plaintiff's complaint demonstrates that the actions of the Oviedo Officer Defendants alleged in Count II do not rise to the level of conscious-shocking. While the officers did know that Ms. Olson was emotional, anxious, and potentially suicidal, such failures to "make a *reasonable* inquiry" or failure to seek "*reasonable* and readily available mental health services" cannot be described as anything more than negligence. (Doc. 69, ¶ 112) (emphasis added). Because the Supreme Court and the Eleventh Circuit have repeatedly and categorically "emphasized the need to prevent the Fourteenth Amendment from becoming a surrogate for conventional tort principle," *Nix*, 311 F.3d at 1376, Plaintiff has failed to make out a constitutional violation under Count II. Because the Court finds that amendment of Count II would be futile, Count II is due to be dismissed with prejudice.

### 2. Count III: § 1983 Claim for Medical Indifference and Whether There is a Violation of a Constitutional Right

In Count III, Plaintiff brings a claim for "medical indifference" against the Oviedo Officer Defendants under 42 U.S.C. § 1983. The primary difference between Count II and

Count III is that Count II targets the actions of the Oviedo Officer Defendants prior to Ms. Olson shooting herself while Count III targets the actions of the Oviedo Officer Defendants *subsequent* to Ms. Olson shooting herself.

Plaintiff again argues that Ms. Olson was detained by the Oviedo Officer Defendants. (Doc. 82, p. 12). Claims under § 1983 by pretrial detainees are analyzed under the Fourteenth Amendment, as opposed to claims by post-conviction prisoners, which are analyzed under the Eighth Amendment. *Woody v. Cronic*, 401 F. App'x 509, 511 (11th Cir. 2010) (per curiam). In a claim for medical indifference, "the [pretrial detainee] must set forth evidence of an objectively serious medical need and prove that the officials acted with attitudes of deliberate inference to his needs." *Id.* "To demonstrate subjective deliberate indifference, the [pretrial detainee] must show that the officials (1) knew of the risk of serious harm; (2) disregarded that risk; and (3) acted with more than just mere negligence." *Id.* at 512.

Alternatively, "'deliberate indifference' is insufficient to constitute a due-process violation in a non-custodial setting." *Nix*, 311 F.3d at 1377. "[S]tate and local government officials violate the substantive due process rights of individuals not in custody *only* when those officials cause harm by engaging in conduct that is 'arbitrary, or conscience shocking, in a constitutional sense,' and that standard is to be narrowly interpreted and applied." *White v. Lemacks*, 183 F.3d 1253, 1259 (11th Cir. 1999) (emphasis added).

Plaintiff's Third Amended Complaint contains several conclusory allegations that Ms. Olson was in the "custody and control" of Defendants (Doc. 69, ¶ 111) and that she was "not free to leave" when Officer Hill ordered Ms. Olson to retrieve her driver's license from inside her home (*id.* ¶ 54). However, accepting all the allegations within the Third

Amended Complaint as true, the Court concludes that Ms. Olson was not a pretrial detainee. Rather, this was a non-custodial setting. Ms. Olson went into her home unaccompanied, where she was able to retrieve her gun. She then went into her backyard, again unaccompanied, and shot herself. As alleged, the facts of the Third Amended Complaint imply that Ms. Olson's freedom should have been more limited, given that the Oviedo Officer Defendants knew that Ms. Olson was a suicide-risk.

Because the facts indicate that Ms. Olson was in a non-custodial setting, the Court again looks to whether the conduct of the Oviedo Officer Defendants was conscious shocking. As discussed above, official action most likely to rise to a conscience-shocking level is "conduct intended to injure in some way unjustifiable by any government interest." *Lewis*, 523 U.S. at 849. Plaintiff alleges that the Oviedo Officer Defendants knew that Ms. Olson was in need of medical attention after she shot herself and that they "willfully and intentionally disregarded this information," depriving Plaintiff of her substantive rights.[8] (Doc. 69, ¶ 120). Specifically, Plaintiff alleges that the Oviedo Officer Defendants failed to provide her with necessary medical care after she shot herself. (*Id.* ¶ 121). Knowing that she was still alive, they failed to summon medical care which, if provided sooner, could have save her life. (*Id.*).

Defendants argue that Plaintiff is unable to establish facts which shock the conscious because the Oviedo Officer Defendants, once Ms. Olson shot herself, had to act quickly under the circumstances and did not have time to deliberate. (Doc. 71, pp. 10–11). Defendants analogize this case to *Lewis*, where officers did not have time to

---

[8] Plaintiff mentions procedural rights in paragraph 120 of the Third Amended Complaint. The Court assumes this was an error as no other facts are alleged to establish a violation of Ms. Olson's procedural due process rights. (*See* Doc. 69, ¶ 120).

deliberate during a police chase and were found not to have violated the decedent's substantive due process rights. "[W]hen unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose." *Lewis*, 523 U.S. at 853. In *Lewis*, the Court held that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under § 1983." *Id.* at 854.

The Court finds that after Ms. Olson was shot, the officers on scene, with the exception of Officer Sacco, had approximately nine minutes to render aid prior to paramedics arriving.[9]   While the Oviedo Officers on scene had to act rapidly under pressure to provide first aid to Ms. Olson, they failed to undertake any lifesaving actions. Therefore, the instant case is distinguished from a police chase in which actual deliberation was not possible.   Rather than providing life support to Ms. Olson in the critical moments following her self-inflicted gunshot wound, the Officers, excluding Officer Sacco, chose to prevent bystanders, including a medically qualified and trained nurse, from providing first aid, chose to secure the weapon and the crime scene, and elected to cancel emergency assistance.   The inaction by the Oviedo Officers, excluding Officer Sacco who was present for one minute before paramedics arrived, distinguishes the instant case from the high-speed chase where officers are engaged in action which precludes calm reflection.

---

[9] Officers D. Mattingly, Barrett and Bologna are inside the residence by 6:01:24 p.m. and report shots fired by 6:01:50.  (Doc. 69, ¶¶ 67–68).  Paramedics are on scene by 6:10:49 p.m. (*Id.* ¶ 87).  Lieutenant Bell is on scene in the backyard for seven minutes before paramedics arrive.  (*Id.* ¶ 72). Officers Meyers and Sacco are on scene in the backyard for approximately one minute before paramedics arrive.  (*Id.* ¶ 73).

As it stands, Plaintiff has pleaded Count III under the deliberate indifference standard, and has not alleged facts to establish that the Oviedo Officer Defendants had intent to harm Ms. Olson. The issue thus turns on whether the decision not to act, by failing to provide first aid, shocks the conscience. The Court finds the allegations contained in Count III are sufficient to satisfy the standard of conduct which shocks the conscience as to the following Defendants:  Officer William Barrett, Lieutenant Dennis Bell, Officer Joseph Bologna, Officer Michael Hill, Officer Daniel Mattingly, and Officer Stephen Rogers. The allegations set forth in the operative complaint accuse these officers of having failed to render first aid when Ms. Olson was still breathing and under circumstances where the failure to do so shocks the conscience.  The complaint further alleges that Officers Bologna, Hill, Barrett, Rogers and Daniel Mattingly prevented a bystander from rendering aid which shocks the conscience where the officers themselves elected not to render aid.  Further the complaint alleges that Officer Bologna checked the victim's pulse, determined she was breathing, and did not perform first aid, which shocks the conscience.   Lieutenant Bell, a commanding officer on scene, failed to direct his subordinates to perform first aid and on two occasions prevented a nurse from rendering aid, which shocks the conscience.  Rather than render aid to the victim, Officers Barrett and Hill chose to put up crime scene tape, which shocks the conscience.  Officer Bologna stood within one foot of the still-breathing victim and, rather than provide aid, elected to secure the shotgun, which shocks the conscience.  The paramedics reported that the offices left them nothing to work with, due to the officers' failure to provide first aid, demonstrating the significance of the officers' decisions.

Count III of the third amended complaint fails to set forth facts which support a finding that Officer Lubrido and Officer J. Mattingly engaged in conduct, subsequent to the self-inflicted gunshot, which shocks the conscience.  Similarly, the Court finds the allegations within the complaint are inadequate to establish that Officer Sacco's presence on the scene one minute prior to the arrival of paramedics and his failure to act within that one minute shocks the conscience.  Officer Sacco had one minute to take stock of the situation, to attempt to comprehend the medical condition of the victim, and to decide whether to take action.  Officer Sacco could reasonably rely upon the non-action by his colleagues as indicating the victim was deceased or beyond assistance.  Officer Sacco's decision-making is analogous to an officer engaged in a high-speed chase.

Defendants' Motion to Dismiss Count III is denied as to Defendants William Barrett, Dennis Bell, Joseph Bologna, Michael Hill, Daniel Mattingly, and Stephen Rogers. The Motion to Dismiss is granted with prejudice as to Defendants Bobby Lubrido, J. Mattingly, and Daniel Sacco.[10]

The Court next addresses whether the constitutional right that Defendants William Barrett, Dennis Bell, Joseph Bologna, Michael Hill, Daniel Mattingly, and Stephen Rogers violated was clearly established on the date of the incident so that it would have been reasonably clear to an officer that their conduct was unlawful. The Court concludes it was. Plaintiff can show that a right was clearly established in one of several ways. First, Plaintiff can point to a binding decision of the Supreme Court of the United States, the United States Court of Appeals for the Eleventh Circuit, or the Florida Supreme Court that is

---

[10] The Court finds the Plaintiff is unable to assert facts which would support a cause of action as to Defendants Lubrido, J. Mattingly, and Sacco, rendering further amendment futile.

materially similar, which would give notice to the police. *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007); *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). Plaintiff can "also show that a broader, clearly established principle should control the novel facts in this situation." *Mercado*, 407 F.3d at 1159. Lastly, Plaintiff can show that the case "fits within the exception of conduct which so obviously violates [the] constitution that prior case law is unnecessary." *Id.* The overriding concern for the Court in finding that a law is clearly established is that an officer must have had "fair warning" that their conduct violated a clearly established constitutional right. *McClish*, 483 F.3d at 1248.

Neither party has located a case factually similar to the instant case. Rather, Plaintiff argues that Defendants' conduct so obviously violated the Constitution that the existence of prior case law is unnecessary. (Doc. 82, p. 17). After considering the unique facts of this case, the Court finds that Officers William Barrett, Dennis Bell, Joseph Bologna, Michael Hill, Daniel Mattingly, and Stephen Rogers should not have needed case law to know that Ms. Olson was at risk of losing her life and needed immediate medical attention after she shot herself at close range with a shotgun. While Ms. Olson was not under arrest, the officers did not allow McKinney or any other bystander, including a registered nurse, to provide medical assistance to her. These officers were the only ones on the scene who could have reasonably provided Ms. Olson with basic life support and ensured that emergency medical assistance was summoned. At this stage of the litigation, the Court finds that their failure to do so caused Ms. Olson to be deprived of her right to life. Thus, Officers William Barrett, Dennis Bell, Joseph Bologna, Michael Hill,

Daniel Mattingly, and Stephen Rogers are not entitled to qualified immunity at this stage of the litigation.[11]

### 3.  Count IV: Wrongful Death

In order to assert a wrongful death claim based on negligence, a plaintiff must allege: (1) a legal duty owed to the decedent; (2) a breach of that duty; (3) the legal or proximate cause of death was that breach; and (4) consequential damages. *Williams*, 974 So. 2d at 1056. The Oviedo Officer Defendants argue that Plaintiff has not pleaded facts sufficient to support a claim for negligence. (Doc. 71, p. 19). Defendants first argue that Plaintiff cannot establish that the Oviedo Officer Defendants owed Ms. Olson a duty under Florida law.

Plaintiff avers that the Oviedo Officer Defendants owed Ms. Olson a general duty to protect her and render aid to her after her apparent suicide attempt. (Doc. 69, ¶¶ 125–26). Florida case law supports this proposition. "A special tort duty does arise when law enforcement officers become directly involved in circumstances which place people within a 'zone of risk' by creating or permitting dangers to exist, by taking persons into police custody, detaining them, or otherwise subjecting them to danger." *Pollock v. Fla. Dep't of Highway Patrol*, 882 So. 2d 928, 935 (Fla. 2004). "The premise underlying this theory is that a police officer's decision to assume control over a particular situation or individual or group of individuals is accompanied by a corresponding duty to exercise reasonable care." (*Id.*). The Florida Supreme Court partially relied on the Second Restatement of Torts in finding a common law duty owed by a sheriff in a situation somewhat similar to

---

[11] Officers William Barrett, Denis Bell, Joseph Bologna, Michael Hill, Daniel Mattingly, and Stephen Rogers may re-assert the defense of qualified immunity at a later stage of this litigation, if appropriate.

the instant case. *Wallace v. Dean*, 3 So. 3d 1035, 1049–53 (Fla. 2009). Section 323 of

the Restatement (Second) of Torts (1965) provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Here, the nine individual officers were all present at some point during this incident,

whether they were called to investigate the earlier traffic accident or were called to

respond to the shots fired. In fact, several of the officers had been at the property earlier

in the day to conduct a suicide check on Ms. Olson. While the officers' main objective at

the Olson residence was to conduct a traffic accident investigation, the facts indicate that

the officers were informed, some for the first time and some not, via radio that Ms. Olson

was a suicide risk. Ms. Olson was then allowed into her residence, *after presenting her

concealed weapons permit*, to retrieve her identification. Officers did not check on her for

approximately twenty minutes. It was then that Ms. Olson shot herself. The allegations go

further though. Allegedly, none of the officers present at the scene called for 911 in a

timely manner. Basic life support was not provided. Officers even turned down the help

of a registered nurse who had offered to help.

Here, the allegations of the Third Amended Complaint support the reasonable

inference that the Oviedo Officer Defendants owed Ms. Olson a duty of care. As alleged

in the complaint, the conduct of the deputies placed Ms. Olson within a foreseeable zone

of risk. Thus, the complaint states a negligence-based wrongful death cause of action against the Oviedo Officer Defendants.

The Court now turns to the question of whether the Oviedo Officer Defendants are immune from suit despite their alleged negligence under Florida Statute § 768.28(9)(a). The statute provides:

> No officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, *unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.*

Fla. Stat. § 768.28(9)(a) (2011) (emphasis added). In Count IV, Plaintiff essentially tracks the language of the statute, alleging that the Oviedo Officer Defendants "acted in bad faith, with malicious purpose, or in a manner exhibiting willful disregard of human rights, safety or property." (Doc. 69, ¶ 126). Plaintiff lists sixteen failures that the Defendants committed, and Plaintiff incorporated by reference in Count IV the Factual Allegations section of the complaint, paragraphs 13 through 92. (*Id.* ¶ 124).

In her response, Plaintiff concedes that "[a]lthough all sixteen failures may not apply to each and every Defendant . . . Plaintiff should be allowed the opportunity to conduct discovery to further investigate which Officer(s) are responsible for each failure." (Doc. 82, p. 7). The Court notes that Florida Statutes § 768.28(9)(a) protects officers of the state from suit except in cases where the officer "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a). The statute plainly requires that Plaintiff allege

sufficient facts to support the allegations that *each* of the nine Oviedo Officers acted in such a way.

The Court has thoroughly reviewed the complaint and Plaintiff has come up short in this regard by failing to specify which Officer is allegedly responsible for the various acts of negligence articulated in Count IV.  (*Id.* ¶ 127 a-p). While all nine officers were, at some point during this incident, present at Ms. Olson's residence, many of the officers arrived at different times and were at different locations on the property. Some officers arrived after Ms. Olson shot herself. In light of the protections § 768.28(9)(a) provides to officers, the Court finds it inappropriate to apply a "totality of the circumstances" test to determine the sufficiency of Plaintiff's complaint. (Doc. 69, ¶ 128). Thus, Plaintiff has failed to allege facts to establish that each Oviedo Officer Defendant "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property" such that he is not entitled to the protection of § 768.28(9)(a). However, Plaintiff shall be allowed to amend Count IV to identify the specific acts of each specific officer as required by § 768.28(9)(a), and thus Count IV will be dismissed without prejudice.

### C.  Counts Against the City

#### 1.  Count V: Wrongful Death

In order to assert a wrongful death claim based on negligence, a plaintiff must allege: (1) a legal duty owed to the decedent; (2) a breach of that duty; (3) the legal or proximate cause of death was that breach; and (4) consequential damages. *Williams,* 974 So. 2d at 1056. The City argues that Plaintiff has not pleaded facts sufficient to support a

claim for negligence. (Doc. 72, p. 5). It first argues that Plaintiff cannot establish that the Oviedo Officer Defendants owed Ms. Olson a duty under Florida law. (*Id.* at pp. 5–8).

As addressed above, the Court finds that the City owed Ms. Olson a duty of care. Plaintiff has pleaded sufficient facts to establish that the officers owed a special duty of care to Ms. Olson because of their knowledge that she was potentially suicidal. *Wallace*, 3 So. 3d at 1047–48. "Activities falling within category II [of *Trianon*] are generally owed to the public at large; however, the plaintiff must be given an opportunity to plead facts alleging that the governmental actor owed the alleged tort victim a '*special duty of care*.'" *Id.* (footnotes omitted) (emphasis in original). A special tort duty can arise when law enforcement becomes involved in circumstances that directly place someone within a zone of risk or by permitting dangers to exist. *Id.* at 1048.

Here, the officers were responding to a traffic accident. However, all officers were notified that one of the persons they were investigating was potentially suicidal. In fact, several of the officers who had responded hours earlier to Ms. Olson's suicide check were also called to the scene of the traffic accident. The officers still allowed Ms. Olson to enter her home where officers must have reasonably assumed guns were located by virtue of Ms. Olson displaying to Officer Hill her concealed weapons ID. Moreover, Plaintiff alleged that the officers at the scene did not timely provide her with medical care or summon emergency medical care, despite their knowledge that the shot was not fatal. Therefore, the Court finds that Plaintiff has established that the City owed Ms. Olson a duty and she has sufficiently set forth all the elements of a wrongful death claim.

### 2.  Count VI: § 1983 Claim for Failure to Train

Plaintiff alleges that the City violated Ms. Olson's constitutional rights based on a theory of failure to adequately train its officers to handle encounters with mentally ill, unstable, or suicidal persons. (Doc. 69, ¶¶ 144–49). "[A]n inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred." *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996). In light of this Court's ruling as to Count III of the Third Amended Complaint, the Court looks to whether Plaintiff has sufficiently pleaded a cause of action for failure to train. *Roach v. City of Fredericktown, Mo.*, 882 F.2d 294, 298 (8th Cir. 1989) (stating that the Supreme Court has recognized that in order for municipal liability to attach for a failure to train, "there must first be an underlying violation of the plaintiff's constitutional rights by a municipal employee").

A municipality can only be found liable under § 1983 when the municipality causes the violation; the theory of respondeat superior cannot be used to hold a municipality liable under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978). Thus, there must exist "a direct causal link between the municipal policy or custom and the alleged constitutional violation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Plaintiff has alleged enough facts to establish that the City failed to train its officers on how to address citizens with mental illness, mental instability, or suicidal thoughts and that this failure to train led to Ms. Olson's deprivation of life. Thus, the motion to dismiss Count VI is due to be denied.

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.  Sprint/United Management Company's Motion to Dismiss the Third

Amended Complaint (Doc. 83) is **GRANTED**. Count I of Plaintiff's Third Amended Complaint is **DISMISSED WITH PREJUDICE.**

2. The Clerk of Court is **DIRECTED** to terminate Defendant Sprint/United Management Company from the case.

3. Defendants William Barrett, Dennis Bell, Joseph Bologna, Michael Hill, Bobby Lubrido, Daniel Mattingly, J. Mattingly, Stephen Rogers, and Daniel Sacco's Motion to Dismiss Third Amended Complaint, or, in the Alternative, Motion for More Definite Statement and Memorandum of Law (Doc. 71) is **GRANTED IN PART AND DENIED IN PART** as follows:

   a. Count II of Plaintiff's Third Amended Complaint is **DISMISSED WITH PREJUDICE**.

   b. Count III of Plaintiff's Third Amended Complaint is **DISMISSED WITH PREJUDICE** as to Defendants Bobby Lubrido, J. Mattingly and Daniel Sacco and is **DENIED** as to Defendants William Barrett, Dennis Bell, Joseph Bologna, Michael Hill, Daniel Mattingly and Stephen Rogers.

   c. Count IV of Plaintiff's Third Amended Complaint is **DISMISSED WITHOUT PREJUDICE**.

4. The Clerk of Court is **DIRECTED** to terminate Defendants Bobby Lubrido, J. Mattingly, and Daniel Sacco from the case.

5. Defendant City of Oviedo's Motion to Dismiss Third Amended Complaint, or, in the Alternative, Motion for More Definite Statement and Memorandum of Law (Doc. 72) is **DENIED.**

6. Plaintiff may file a Fourth Amended Complaint **on or before May 4, 2015** to correct the deficiencies identified in those counts which were dismissed without prejudice. If Plaintiff chooses to file a Fourth Amended Complaint, Plaintiff shall set forth her request for damages to reflect the clarification she provided in her Amended Response to the City's and the Oviedo Officer Defendants' Motions to Dismiss (Doc. 82).

**DONE AND ORDERED** in Orlando, Florida on March 20, 2015.



PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record